IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2013 Term

_____

No. 11-1014

_____

FILED

**May 20, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

TERRY ALLEN BLEVINS,
Defendant Below, Petitioner

_____

Appeal from the Circuit Court of Mercer County
The Honorable Derek C. Swope, Judge
Case No. 09-F-12-DS

AFFIRMED
_____

Submitted: March 26, 2013
Filed: May 20, 2013

David B. Kelley, Esq.                    Patrick Morrisey, Esq.
The Kelley Law Firm                      Attorney General
Bluefield, West Virginia                 Laura Young, Esq.
Attorney for Petitioner                  Assistant Attorney General
                                         Charleston, West Virginia
                                         Attorneys for Respondent

The Opinion of the Court was delivered PER CURIAM.

SYLLABUS BY THE COURT

1.  "In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review.  We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard.  Questions of law are subject to a *de novo* review."  Syl. Pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000).

2.  "'"Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence."  Syl. pt. 4, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976).'  Syllabus point 1, *Andrews v. Reynolds Memorial Hospital, Inc.*, 201 W.Va. 624, 499 S.E.2d 846 (1997)."  Syl. Pt. 1, *Lively v. Rufus*, 207 W.Va. 436, 533 S.E.2d 662 (2000).

3.  "Widespread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the

i

prejudice against him is so great that he cannot get a fair trial." Syl. Pt. 1, *State v. Gangwer*, 169 W.Va. 177, 286 S.E.2d 389 (1982).

4. "One of the inquiries on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt or innocence of the defendant." Syl. Pt. 3, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).

5. "'To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused.' Syl. pt. 2, *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946)." Syl. Pt. 2, *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983).

6. "'Where a person voluntarily and knowingly consents to a search of his premises, such a search may be conducted in the absence of a search warrant.' Syllabus

Point 1, *State v. Basham*, 159 W.Va. 404, 223 S.E.2d 53 (1976)." Syl. Pt. 1, *State v. Hambrick*, 177 W.Va. 26, 350 S.E.2d 537 (1986).

7. "In deciding if a consent to search is valid, the trial court must make a factual determination whether the consenting party possessed the requisite authority over or relationship to the premises to be searched to justify his allowing the police to conduct a search." Syl. Pt. 3, *State v. Hambrick*, 177 W.Va. 26, 350 S.E.2d 537 (1986).

8. "A trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." Syl. Pt. 4, *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998).

9. "'Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk*, 171 W.Va. 639, 301 S.E.2d 596, 599 (1983)." Syl. Pt. 2, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983).

10. "'A trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence.'

*State v. Vance*, 162 W.Va. 467, 250 S.E.2d 146 (1978)." Syl. Pt. 1, *State v. Jones*, 220 W.Va. 214, 640 S.E.2d 564 (2006).

11. "When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error." Syl. Pt. 1, *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996).

12. "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syl. Pt. 1, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

13. "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syl. Pt. 3, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

14. "When a criminal defendant undertakes a sufficiency challenge, all the evidence, direct and circumstantial, must be viewed from the prosecutor's coign of vantage, and the viewer must accept all reasonable inferences from it that are consistent with the verdict. This rule requires the trial court judge to resolve all evidentiary conflicts and credibility questions in the  prosecution's favor; moreover, as among competing inferences of which two or more are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt." Syl. Pt. 2, *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996).

15. "Although premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed." Syl. Pt. 5, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

16. "In criminal cases where the State seeks a conviction of first degree murder based on premeditation and deliberation, a trial court should instruct the jury that murder in the first degree consists of an intentional, deliberate, and premeditated killing which means that the killing is done after a period of time for prior consideration. The duration of that period cannot be arbitrarily fixed. The time in which to form a deliberate and premeditated design varies as the minds and temperaments of people differ and according to the circumstances in which they may be placed. Any interval of time between the forming of the intent to kill and the execution of that intent, which is of sufficient duration for the accused to be fully conscious of what he intended, is sufficient to support a conviction for first degree murder." Syl. Pt. 6, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995).

17. "In determining whether an out-of-court identification of a defendant is so tainted as to require suppression of an in-court identification a court must look to the

totality of the circumstances and determine whether the identification was reliable, even though the confrontation procedure was suggestive, with due regard given to such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Syl. Pt. 3, *State v. Casdorph*, 159 W.Va. 909, 230 S.E.2d 476 (1976).

18. "Most courts have concluded that a photographic array will not be deemed excessively suggestive as long as it contains some photographs that are fairly representative of the defendant's physical features. The fact that some of the photographs are dissimilar to the defendant's appearance will not taint the entire array." Syl. Pt. 6, *State v. Harless*, 168 W.Va. 707, 285 S.E.2d 461 (1981).

19. "Pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* bars the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness." Syl. Pt. 6, *State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006).

20. "Although it is a well-settled policy that the Supreme Court of Appeals normally will not rule upon unassigned or imperfectly assigned errors, this Court will take cognizance of plain error involving a fundamental right of an accused which is protected by the Constitution." Syl. Pt. 4, *State v. Starr*, 158 W.Va. 905, 216 S.E.2d 242 (1975).

21. "Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt." Syl. Pt. 5, *State ex rel. Grob v. Blair*, 158 W.Va. 647, 214 S.E.2d 330 (1975).

22. "In a criminal case, the burden is upon the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Syl. Pt. 3, *State v. Frazier*, 229 W.Va. 724, 735 S.E.2d 727 (2012).

23. "Punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity, thereby violating *West Virginia Constitution, Article III Section 5* that prohibits a penalty that is not proportionate to the character and degree of an offense." Syl. Pt. 5, *State v. Cooper*, 172 W.Va. 266, 304 S.E.2d 851 (1983).

Per Curiam:

This is an appeal by Terry Blevins from an order of the Circuit Court of Mercer County, West Virginia, denying Mr. Blevins' motion for a new trial subsequent to his conviction for two counts of first degree murder and one count of first degree arson. Mr. Blevins received a sentence of two consecutive terms of life in prison without the possibility of parole for the murders, as well as a sentence of twenty years for the arson, to run consecutively. Mr. Blevins contends that the trial court committed a multitude of errors, each of which will be addressed independently below. Subsequent to a thorough review of the parties' briefs, arguments, appendix record, and applicable precedent, this Court finds no error and consequently affirms the order of the circuit court.

## I. Factual and Procedural History

At approximately 2:00 p.m. on August 11, 2008, Delores Barton and her husband, James Barton, were found dead on their property near Princeton, Mercer County, West Virginia. Mrs. Barton's body was removed from her burning home by passing motorists, and Mr. Barton's body subsequently was found in a locked storage building on the Bartons' property. Evidence later introduced at trial indicated that Mr. and Mrs. Barton, both age seventy-four, had been beaten to death. A baseball bat was located near Mrs. Barton's

1

body in the kitchen, and a crowbar and hatchet were located beside Mr. Barton's body in the storage building.

During the ensuing investigation of the deaths, police officers learned that the Bartons' neighbor, Mr. John Reed, had observed a stranger in the neighborhood at approximately 9:00 a.m. on the morning of the murders.[1] Based upon Mr. Reed's description of that individual and his automobile, a silver Hyundai with temporary Virginia registration, the police were able to locate the vehicle.

When Sergeant Gary W. Woods and Corporal J.J. Ruble of the Mercer County Sheriff's Department knocked on the door of the home at which the vehicle was parked, they noticed a strong odor of drugs. The officers obtained the permission of the renter of the home, Ms. Brittany Davis,[2] to search the home, and the officers thereafter located bags of marijuana inside. Corporal Ruble arrested Mr. Blevins on a drug charge at approximately

---

[1]Mr. Reed had also observed an unrelated apparently disabled vehicle in front of the Barton residence two days prior to the murders. Mr. Reed testified that a stranger had arrived at Mr. Reed's house on the morning of the murders with the stated intention of inquiring about that vehicle and whether it had been towed.

[2]Ms. Davis was Mr. Blevins' girlfriend. She rented her home and permitted Mr. Blevins to reside there with her. Mr. Blevins did not have any legal interest in the property. Charges of accessory after the fact to murder were dropped against Ms. Davis in exchange for her cooperation, and the jury was apprised of this fact.

5:45 p.m. on the evening of August 11, 2008,[3] and transported him to the Mercer County

Sheriff's Department in Princeton, West Virginia. While being questioned on the drug

charge, Mr. Blevins initially denied any familiarity with the neighborhood in which the

Bartons lived and stated that he had not been present in the vicinity that day.

At approximately 7:00 p.m. that evening, the Mercer County Sheriff's

Department assembled a photo array, which included a photo of Mr. Blevins. Mr. Reed

thereafter identified Mr. Blevins as the stranger he had seen and spoken with near the Barton

home earlier that morning. When Mr. Blevins learned that he had been identified by Mr.

Reed, he admitted that he was in the Bartons' neighborhood but denied any knowledge of

their deaths.

Captain M.L. Gills of the Mercer County Sheriff's Department, the lead

investigator of the murders, informed Mr. Blevins of his *Miranda*[4] rights at approximately

10:40 p.m. Thereafter, Mr. Blevins agreed to take a polygraph test, and Sergeant Christopher

C. Smith was contacted at approximately 10:30 or 11:00 p.m. to administer the test. Sergeant

---

[3]Mr. Blevins was charged with one count of possession with intent to deliver marijuana. This drug charge was severed from the murder charges and is not at issue in this appeal. Additionally, one count of burglary with which Mr. Blevins was charged was also dismissed at the close of evidence at trial and was not presented to the jury.

[4]*See Miranda v. Arizona*, 384 U.S. 436 (1966) (explaining that law enforcement officers must inform suspects of certain fundamental constitutional rights prior to initiating custodial interrogation).

Smith's first attempt to administer the polygraph test began at approximately 1:08 a.m. on August 12, 2008, and Mr. Blevins was provided with his *Miranda* rights again at that time. During that polygraph examination, Mr. Blevins asked if he could take a break to rest. The officers honored that request, and Corporal Ruble began transporting Mr. Blevins to the Bluefield City Jail to allow him to rest there. While in transit, Mr. Blevins told Corporal Ruble that he had seen two deceased persons and requested that he be permitted to speak with investigators again.

Upon his return to Princeton, Mr. Blevins was again advised of his *Miranda* rights at approximately 3:35 a.m., and he proceeded to take a polygraph examination. Mr. Blevins also informed officers that he had witnessed another individual, Justin Stacy, kill the victims.[5] Between 4:00 and 5:00 a.m., Detective Gills attempted to obtain a search warrant for Ms. Davis' home. Although the initial request was denied, the request was subsequently granted by the circuit court after Detective Gills inserted a handwritten line on the warrant

---

[5]According to the State's brief, some of this information concerning the alleged existence of a "Justin Stacy" was apparently elicited without any additional discussion of constitutional rights and without execution of another *Miranda* waiver. Prior to trial, the State agreed that Mr. Blevins had made certain statements about seeing a Justin Stacy kill the victims which might not have been covered by any *Miranda* warning. Consequently, those statements were deemed inadmissible in the State's case in chief. The statements, however, were ultimately admitted after Mr. Blevins' counsel broached the notion of Justin Stacy as a possible suspect during his cross examination of police witnesses. Thus, the circuit court thereafter permitted the State to examine Captain Gills regarding the Justin Stacy allegations made by Mr. Blevins. No one named Justin Stacy or fitting the description as provided by Mr. Blevins was ever identified.

indicating that Mr. Blevins "has confessed to being at the residence and had seen the two victims dead at the residence."

The warrant notwithstanding, Ms. Davis again gave the investigators permission to search of her home, and the search[6] of her residence was conducted at 5:45 a.m. on August 12, 2008. During the search, the officers located a set of keys fitting the locks of the Bartons' automobiles and the padlock on the storage building in which Mr. Barton's body had been found. The officers also seized ashes from a burn pile in the backyard. Mr. Blevins was arraigned on the murder charges at approximately 1:00 p.m. on August 12, 2008.

During police interviews with Ms. Davis, she informed investigators that Mr. Blevins had returned to her home with blood on his face on the day of the murders. Ms. Davis also stated that Mr. Blevins had immediately burned his clothing in the backyard of her home. Further, Ms. Davis indicated that Mr. Blevins had telephoned her from what she believed to be the Bartons' home.

---

[6]It is important to note that Ms. Davis had provided two separate consents to search her home, as discussed in section III B of this opinion. The reason for seeking a search warrant in addition to the permission granted by Ms. Davis is unclear from the record. Detective Gills explained during a suppression hearing that he had been in the process of obtaining the search warrant when Ms. Davis provided her consent to search her home.

Trial in this matter was conducted from April 13 to April 15, 2010. Mr. Blevins was convicted on two counts of first degree murder and one count of first degree arson. His motion for a new trial was denied subsequent to a May 27, 2010, hearing, and he now appeals to this Court.

## II. Standard of Review

While many of the alleged errors raised by Mr. Blevins in this appeal are subject to particular standards of review, which we set forth in connection with our discussion of each of those alleged errors herein, this Court also recognizes general standards for reviewing findings and rulings made by a trial court, as follows:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. Pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000); *see also Tennant v. Marion Health Care Found.*, 194 W.Va. 97, 459 S.E.2d 374 (1995).

Additionally, because this matter is on appeal from the circuit court's order denying Mr. Blevins' motion for a new trial, this Court reasserts its standard of review applicable to appellate review of the denial of a motion for new trial, as follows:

6

"'Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence.' Syl. pt. 4, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976)." Syllabus point 1, *Andrews v. Reynolds Memorial Hospital, Inc.*, 201 W.Va. 624, 499 S.E.2d 846 (1997).

Syl. Pt. 1, *Lively v. Rufus*, 207 W.Va. 436, 533 S.E.2d 662 (2000).


III.  Discussion

Mr. Blevins presents assignments of error challenging the following general issues:  proper venue; improper search of Ms. Davis' home; voluntariness of Mr. Blevins' statements; prompt presentment; evidence of telephone conversations from jail; introduction of certain other evidence; insufficiency of evidence; tainted photographic array; violation of the Confrontation Clause; violation of proportionality principles in the imposition of sentence; and inadequacy of Mr. Blevins' counsel's objection to the Confrontation Clause violation.   This Court will address each of those issues independently below.


A.  Venue

In challenging the circuit court's decision to permit the trial to be held in the Circuit Court of Mercer County, Mr. Blevins contends that a hostile sentiment existed within the community from which the jury pool was drawn.  He suggests that many potential jurors

had particularized knowledge of the accusations against him, based upon newspaper reports and the general sentiment within the community.

A hearing on Mr. Blevins' motion for a change of venue was conducted on October 27, 2009. As evidence to support his motion, Mr. Blevins' counsel submitted newspaper clippings, as well as the results of a public opinion survey commissioned by the defense and authorized by the circuit court. Mr. Blevins claims that the survey indicated that only 40% of the 206 people surveyed could presume innocence, and 79% were knowledgeable of the media coverage of the murders. Mr. Blevins also introduced evidence that one individual had heard a local radio talk show program suggesting that the murderer should be hanged.

The State responded to Mr. Blevins' assertions on his motion for change of venue by explaining that the testimony of Mr. Blevins' expert on the public opinion poll actually indicated that 60% of those surveyed could presume innocence. The State also argued that a majority of those surveyed indicated that Mr. Blevins could receive a fair trial in Mercer County.

In resolving the venue issue, the circuit court observed that the appropriate inquiry on a motion for change of venue is not whether prospective jurors had ever heard of

a case, but rather whether they had such fixed opinions that impartiality was impossible. The circuit court suggested the use of a jury questionnaire to assess the likelihood that an impartial jury could be selected. Thus, a jury questionnaire was developed and agreed upon by both prosecution and defense. Subsequent to the removal of 28 of the 113 potential jurors based upon their responses to that jury questionnaire, Mr. Blevins did not take exception to the circuit court's finding that the impaneled jury was a competent and impartial one capable of providing Mr. Blevins with a fair trial. The circuit court noted that it had excused those venire member about whom Mr. Blevins expressed reservations.

While this Court is mindful of the admonition that "influences, even though silent, may so permeate a community as to make their impression upon the jury," this Court is also cognizant of the fact that extensive publicity does not necessarily require a change in venue. *State v. Weisengoff*, 85 W.Va. 271, 278, 101 S.E. 450, 453 (1919). In syllabus point one of *State v. Gangwer*, 169 W.Va. 177, 286 S.E.2d 389 (1982), this Court stated that "[w]idespread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against him is so great that he cannot get a fair trial."

Similarly, as the circuit court observed in ruling on the motion for a change of venue, this Court explained in syllabus point three of *State v. Derr*, 192 W.Va. 165, 451

9

S.E.2d 731 (1994), that "[o]ne of the inquiries on a motion for a change of venue should not be whether the community remembered or heard the facts of the case, but whether the jurors had such fixed opinions that they could not judge impartially the guilt or innocence of the defendant." A motion for a change of venue should be granted when it is shown that there is a present hostile sentiment against the accused extending throughout the entire county. *See* Syl. Pt. 1, *State v. Goodmon*, 170 W.Va. 13, 290 S.E.2d 260 (1981).

Moreover, a ruling on a motion for a change of venue is within the discretion of the circuit court and will not be disturbed unless such discretion has been abused. Syllabus point two of *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983), crystallized that point as follows:

> "To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests on the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused." Syl. pt. 2, *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946).

Upon review by this Court, it appears that the circuit court exercised its discretion appropriately in determining that a change of venue was not necessary and that Mr. Blevins could receive a fair trial in the Circuit Court of Mercer County. The circuit court's

efforts to fairly evaluate the issue of potential bias against Mr. Blevins were evident in its

authorization of the public opinion survey, its extensive discussions and hearing regarding

the methodology and results of that survey, and its utilization of a juror questionnaire to

ascertain the degree of prejudice existing in each potential juror. The evidence presented by

Mr. Blevins does not indicate that there existed such a pervasive, hostile sentiment against

him that it was impossible, or even particularly difficult, to impanel an impartial jury. We

find no merit in Mr. Blevins' arguments and affirm the circuit court's determinations on this

issue.


## B. Consent to Search and Search Warrant

Mr. Blevins challenges the second search of Ms. Davis' home on two distinct

grounds. First, he asserts that the consent provided by Ms. Davis to search her home was

coerced. Second, he asserts that the warrant to search the home was improperly obtained.[7]

Thus, he argues that neither the consent nor the search warrant was valid and that the articles

obtained in the search, most prominently the remnants of burned clothing and the keys to the

Bartons' storage building and vehicles, should have been suppressed. Counsel for Mr.

---

[7]It is not entirely clear under our precedents whether Mr. Blevins has standing to challenge the voluntariness of Ms. Davis' consent, since the residence searched was rented by Ms. Davis. *See State v. Abdelhag*, 214 W.Va. 269, 276 & n.1, 588 S.E.2d 647, 654 & n.1 (2003) (Davis, J., concurring) (collecting cases involving search of hotel room occupied by defendant). However, inasmuch as the State apparently did not raise the question of standing in the proceedings below and has not raised it on appeal, we deem the issue waived and will consider Mr. Blevins' arguments on the merits.

Blevins filed a motion to suppress in November 2009, and the circuit court denied that motion after a hearing.

With regard to the consent twice given by Ms. Davis to search her home, Mr. Blevins contends that such consent was not voluntary. Rather, Mr. Blevins argues that the consent was coerced by Ms. Davis' cousin, Corporal Steven A. Sommers of the Mercer County Sheriff's Department. At the hearing on the motion to suppress, Ms. Davis testified that she and Mr. Blevins lived together in a home she rented. She further testified that on the afternoon of August 11, 2008, she provided unqualified permission for several police officers to search her residence. She also indicated that she gave permission for a second search of her residence. She explained that although she and Corporal Sommers did discuss the case, he did not pressure her into providing permission to search her home.

This Court has consistently held that an occupant of a home may consent to a search of that home. In syllabus point one of *State v. Hambrick*, 177 W.Va. 26, 350 S.E.2d 537 (1986), this Court explained that "'[w]here a person voluntarily and knowingly consents to a search of his premises, such a search may be conducted in the absence of a search warrant.' Syllabus Point 1, *State v. Basham*, 159 W.Va. 404, 223 S.E.2d 53 (1976)." As this Court observed in syllabus point three of *Hambrick,* a factual determination must be made regarding the consenting party's authority over the premises to be searched. "In deciding if

a consent to search is valid, the trial court must make a factual determination whether the consenting party possessed the requisite authority over or relationship to the premises to be searched to justify his allowing the police to conduct a search." *Id.* at 26, 350 S.E.2d at 538, syl. pt. 3. Based upon the evidence on this issue, particularly Ms. Davis' testimony regarding her consent, this Court finds no abuse of discretion in the lower court's determination that Ms. Davis' consent was voluntarily provided to police officers and that Ms. Davis had the requisite authority over the premises searched.

In his challenge to the validity of the search warrant, Mr. Blevins asserts that Detective Gills obtained the search warrant illegally[8] by including a reference, in Detective Gills' own handwriting, to the effect that Mr. Blevins had "confessed to being at the [victims'] residence and had seen the two victims dead at the residence." Although Mr. Blevins contends that his statement regarding being at the residence was obtained only after excessive and arduous interrogation, the circuit court found that all of Mr. Blevins' inculpatory statements, including the one utilized in obtaining the search warrant, were

---

[8]In syllabus point one of *State v. Hall*, 171 W.Va. 212, 298 S.E.2d 246 (1982), this Court explained as follows:

"To constitute probable cause for the issuance of a search warrant, the affiant must set forth facts indicating the existence of criminal activities which would justify a search and further, if there is an unnamed informant, sufficient facts must be set forth demonstrating that the information obtained from the unnamed informant is reliable." Syllabus point 1, *State v. Stone*, 165 W.Va. 266, 268 S.E.2d 50 (1980).

13

voluntarily made and admissible at trial. Moreover, it is clear that the search warrant was ultimately unnecessary because Ms. Davis twice consented to the search of her residence.

Upon review by this Court, we find no abuse of discretion in the circuit court's finding that the evidence obtained as a result of the search of Ms. Davis' home was admissible at trial. Ms. Davis was unquestionably the individual having dominion over the property in question, and she voluntarily consented to the search on two occasions. While she may have elevated her level of cooperation with the investigation in order to remain free of suspicion of involvement with her boyfriend, there is no credible evidence that her consent was coerced by her cousin, Corporal Sommers, or any other individual involved in this investigation. In light of Ms. Davis' consent, this Court further affirms the circuit court's finding that any irregularities in the method of obtaining the search warrant did not constitute error requiring suppression of the items seized in the search.

C. Mr. Blevins' Statement

Mr. Blevins contends that his statement that he was present at the Barton residence and observed two dead victims at the scene should not have been admitted at trial. He maintains that such statement was made only after hours of excessive interrogation and following a specific request to cease questioning to allow him time to rest. As referenced above, the record reveals that Mr. Blevins was initially arrested for possession of marijuana

with intent to deliver at approximately 5:45 p.m. on the afternoon of August 11, 2008. According to the testimony of the investigating officers, *Miranda* warnings were administered to Mr. Blevins, and he subsequently agreed to take a polygraph examination. *Miranda* warnings were again administered to him prior to that examination. Upon becoming tired and requesting a period of rest, officers honored Mr. Blevins' request for respite and began transporting him to Bluefield City Jail. In route to that facility, Mr. Blevins made statements about seeing the deceased victims, and according to the testimony of police officers, Mr. Blevins requested that he be returned to Princeton to speak to investigators. Upon Mr. Blevins' return, Sergeant Smith again reviewed the *Miranda* rights and waiver form.

Evidentiary rulings are reviewed by this Court under an abuse of discretion standard. As this Court stated in syllabus point four of *State v. Rodoussakis*, 204 W.Va. 58, 511 S.E.2d 469 (1998), "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to review under an abuse of discretion standard." *See also* Syl. Pt. 2, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983) ("'Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk*, 171 W.Va. 639, 301 S.E.2d 596, 599 (1983).").

With specific regard to the voluntariness of a statement such as the one made

by Mr. Blevins, this Court has held that "'[a] trial court's decision regarding the

voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly

against the weight of the evidence.' *State v. Vance*, 162 W.Va. 467, 250 S.E.2d 146 (1978)."

Syl. Pt. 1, *State v. Jones*, 220 W.Va. 214, 640 S.E.2d 564 (2006).  Moreover, as this Court

explained in syllabus point one of *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996),

> [w]hen reviewing a ruling on a motion to suppress, an
> appellate court should construe all facts in the light most
> favorable to the State, as it was the prevailing party below.
> Because of the highly fact-specific nature of a motion to
> suppress, particular deference is given to the findings of the
> circuit court because it had the opportunity to observe the
> witnesses and to hear testimony on the issues.  Therefore, the
> circuit court's factual findings are reviewed for clear error.

Additionally, any allegations of police coercion in obtaining a statement and questions of

whether a statement was voluntary are to be determined from a review of the totality of the

circumstances.  *State v. Milburn*, 204 W.Va. 203, 210, 511 S.E.2d 828, 835 (1998).

In the case *sub judice*, Mr. Blevins challenges the voluntary nature of his

waiver of his *Miranda* warnings and subsequent inculpatory statements.  He attempted to

elicit evidence during trial substantiating his claim that he was so fatigued during the police

questioning that he was incapable of effectively waiving his rights.[9]  Beyond these broad

---

[9]Mr. Blevins also contends that he should have been promptly presented to a magistrate on the drug charges, which are not a subject of this appeal.  West Virginia Code
(continued...)

16

assertions by Mr. Blevins, however, minimal evidence exists to support a finding that his level of fatigue was significant enough to render it impossible for him to make a knowing and voluntary waiver of his rights. The officers who interviewed him and advised him of his *Miranda* rights testified that he appeared perfectly aware and cognizant of the situation and did not appear to be overly tired or impaired in any manner. When he requested a break from questioning, his transport to Bluefield City Jail was arranged to allow a rest period. As noted above, Corporal Ruble testified that Mr. Blevins thereafter requested that he be returned to Princeton for additional discussion with investigators.

This Court finds no error in the circuit court's conclusion that Mr. Blevins freely and voluntarily waived his *Miranda* rights on at least three separate occasions and agreed to speak to the police investigators. This Court finds Mr. Blevins' argument that his level of fatigue rendered it impossible to effectively waive his rights wholly without merit.

---

[9](...continued)
§ 62–1–5(a)(1) (2010) provides: "An officer making an arrest under a warrant issued upon a complaint . . . , shall take the arrested person without unnecessary delay before a magistrate of the county where the arrest is made." Further, Mr. Blevins contends that any statements he made after he should have been presented to a magistrate for arraignment on the drug charges should have been suppressed. Mr. Blevins' argument on the prompt presentment issue is essentially another method of asserting that his statements regarding the murders were not admissible. We find this argument unpersuasive. Mr. Blevins was arraigned on the drug charge at approximately 9:00 or 9:30 a.m. on the day following his arrest, and a magistrate was not available after 10:00 p.m. on the evening of the alleged crimes. *See State v. Milburn*, 204 W.Va. 203, 511 S.E.2d 828 (1998) (holding that delay in presenting defendant to magistrate did not violate prompt presentment rule where delay was for purpose of questioning defendant about crime for which he was not arrested).

Moreover, the circuit court thoroughly addressed Mr. Blevins' arguments during the suppression hearing, giving particular attention to the time sequence regarding the provision of *Miranda* rights and the admissibility of Mr. Blevins' statements. Upon review by this Court, we find that his statements were properly admitted at trial.

D. Evidentiary Rulings Regarding Admissibility of Telephone
Conversations from Jail; Alleged Murder Weapons; and Keys Located During Search

As referenced above in this Court's evaluation of the voluntariness of Mr. Blevins' statement, this Court has consistently utilized the following standard of review of a trial court's ruling on a motion to suppress:

> When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.

*Lacy*, 196 W.Va. at 107, 468 S.E.2d at 722, syl. pt. 1; *see also* Syl. Pt. 3, *State v. Stuart*, 192 W.Va. 428, 452 S.E.2d 886 (1994) ("On appeal, legal conclusions made with regard to suppression determinations are reviewed *de novo*. Factual determinations upon which these legal conclusions are based are reviewed under the clearly erroneous standard. In addition, factual findings based, at least in part, on determinations of witness credibility are accorded great deference.").

18

Pursuant to Rule 403 of the West Virginia Rules of Evidence, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." This Court has repeatedly held that a trial court's decision that the probative value of evidence is not substantially outweighed by its prejudicial effect is reviewed *only* for abuse of discretion. *Derr*, 192 W.Va. at 168, 451 S.E.2d at 734, syl. pt. 10 (holding, in part, that "[a]s to the balancing under Rule 403, the trial court enjoys broad discretion. The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse."); *see also Gable v. Kroger Co.*, 186 W.Va. 62, 66, 410 S.E.2d 701, 705 (1991) ("Rules 402 and 403 of the West Virginia Rules of Evidence [1985] direct the trial judge to admit relevant evidence, but to exclude any evidence the probative value of which is substantially outweighed by the danger of unfair prejudice to the defendant. Such decisions are left to the sound discretion of the trial judge . . . .").

With regard to the admissibility of recorded phone conversations between Mr. Blevins and Ms. Davis while he was in the Southern Regional Jail, Mr. Blevins contends that the recording of these conversations was a violation of his privacy and that the circuit court's decision to allow their introduction into evidence was prejudicial. Although Mr. Blevins did not make any direct admissions of guilt during these phone conversations, he did instruct his girlfriend, Ms. Davis, to make sure that all his clothing had fully burned in the backyard burn

19

pile so that "they don't have no solid pieces of nothing." He also requested that she dispose of a camera at a location other than the house, and he asked Ms. Davis to locate his black bag and the keys he had "picked up."

During a circuit court hearing on the admissibility of the contents of the phone calls in question, jail officials testified that every inmate is given a handbook which contains a specified warning that all telephone calls, except to attorneys, may be monitored and recorded. Additionally, signs posted near each telephone warn inmates that calls will be monitored and recorded. On the telephone call itself, a recorded voice states that calls are monitored and recorded. The circuit court determined that Mr. Blevins knew he was being recorded and that no violation of privacy occurred in this regard. The circuit court also concluded that the information provided in the exchange between Mr. Blevins and Ms. Davis in the telephone conversations was more probative than prejudicial. This Court's review of the record reveals no abuse of discretion in the circuit court's decision to permit introduction of the telephone conversations. The probative value of the telephone conversations, as indicative of Mr. Blevins' overt attempts to conceal evidence of his involvement with the

20

murders, was not substantially outweighed by the danger of unfair[10] prejudice. *See* W.Va. R. Evid. 403.

Mr. Blevins also asserts that the alleged murder weapons and related photographs should not have been admitted at trial.[11] He contends that their probative value was substantially outweighed by the danger of unfair prejudice. As the State points out, however, Mr. Blevins did not object to introduction of the weapons found at the scene. Thus, this issue was not properly preserved as an assignment of error. *See* Syl. Pt. 4, *State v. Browning*, 199 W.Va. 417, 485 S.E.2d 1 (1997) ("This Court will not consider an error which is not properly preserved in the record nor apparent on the face of the record.").[12]

---

[10]In weighing the probative value and the danger of *unfair* prejudice, it is imperative to note that the purpose of Rule 403 is not to exclude all evidence that results in prejudice to a defendant. It is the danger of *unfair* prejudice to which a reviewing court must be attuned. Under Rule 403, "[u]nfair prejudice does not mean damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggests [sic] decision on an improper basis." *State v. LaRock*, 196 W.Va. 294, 312, 470 S.E.2d 613, 631 (1996) (citation omitted).

[11]The State maintains that these items were properly introduced during the course of police testimony about the crime scene and the items found near the bodies. There was no DNA evidence found on these weapons linking Mr. Blevins to the crime scene.

[12]In his reply brief, Mr. Blevins raises an issue concerning the chain of custody of the keys found in Ms. Davis' home. Captain Gills testified that the keys were located in Ms. Davis' home, and it was thereafter determined that the keys did indeed open the Bartons' automobiles and storage building The keys were returned to the victims' family to have additional car keys made from those keys. The State indicated during oral argument that the testing of the keys was conducted prior to giving the keys back to the victims' family for the making of additional keys. This Court finds that the custody of the keys subsequent to the

(continued...)

E.  Insufficiency of Evidence and Motion to Dismiss

Mr. Blevins asserts that the circuit court erred in failing to grant his motion to dismiss based upon insufficiency of the evidence and in subsequently permitting the jury to convict him of two counts of first degree murder based upon evidence he deems insufficient to support such convictions.   Specifically, Mr. Blevins contends that insufficient evidence of malice, premeditation, and deliberation was introduced to support the convictions for first degree murder.

In response, the State catalogs the evidence against Mr. Blevins and argues that the evidence was sufficient to justify the jury's decision to convict Mr. Blevins on two counts of first degree murder.  The State emphasizes the eyewitness testimony placing Mr. Blevins at the scene, as well as Mr. Blevins' inconsistent explanations regarding his presence at the victims' home.[13]  Additionally, although Mr. Blevins claimed that a "Justin Stacy" had committed the murders, Mr. Blevins provided conflicting descriptions of this person, and no

_____

[12](...continued)
time it was determined that they fit the Bartons' automobiles and storage building is irrelevant to this appeal, and Mr. Blevins' contentions in this regard are without merit.

[13]Mr. Blevins first claimed that he was unfamiliar with the neighborhood of Kegley, in which the Bartons resided.  Subsequently, Mr. Blevins claimed he was at the residence to speak with Mrs. Barton about repairing a water pump or hot tub.  He also claimed he was there to help a friend start her car.

22

such individual was ever located or determined to exist.  The State also emphasizes the fact

the the Bartons' automobile keys and storage building keys were found at the residence in

which Mr. Blevins lived.  Further, the jury heard testimony that Mr. Blevins had blood on his

face upon returning to his girlfriend's home, that he burned his clothing, and that he

repeatedly asked his girlfriend to destroy various pieces of evidence.

With regard to the standard of review applied to challenges to the sufficiency

of the evidence, this Court has explained as follows:

> The function of an appellate court when reviewing the
> sufficiency of the evidence to support a criminal conviction is to
> examine the evidence admitted at trial to determine whether
> such evidence, if believed, is sufficient to convince a reasonable
> person of the defendant's guilt beyond a reasonable doubt. Thus,
> the relevant inquiry is whether after viewing the evidence in the
> *light most favorable to the prosecution*, any rational trier of fact
> could have found the essential elements of the crime proved
> beyond a reasonable doubt.

Syl. Pt. 1, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995) (emphasis supplied).  This

Court also elaborated on that issue in syllabus point three of *Guthrie*, as follows:

> A criminal defendant challenging the sufficiency of the
> evidence to support a conviction takes on a heavy burden. An
> appellate court must review all the evidence, *whether direct or
> circumstantial*, in the light most favorable to the prosecution and
> must credit all inferences and credibility assessments that the
> jury might have drawn in favor of the prosecution. The evidence
> need not be inconsistent with every conclusion save that of guilt
> so long as the jury can find guilt beyond a reasonable doubt.
> Credibility determinations are for a jury and not an appellate
> court. Finally, a jury verdict should be set aside only when the

> *record contains no evidence, regardless of how it is weighed*,
> from which the jury could find guilt beyond a reasonable doubt.
> To the extent that our prior cases are inconsistent, they are
> expressly overruled.

*Id*. at 663, 461 S.E.2d at 169, syl. pt. 3 (emphasis supplied).[14]

In syllabus point two of *State v. LaRock*, 196 W.Va. 294, 470 S.E.2d 613 (1996), this Court emphasized the necessity to view all evidence in the light most favorable to the prosecution and to resolve all evidentiary conflicts in favor of the prosecution. That syllabus point provides as follows:

> When a criminal defendant undertakes a sufficiency
> challenge, all the evidence, direct and circumstantial, must be
> viewed from the prosecutor's coign of vantage, and the viewer
> must accept all reasonable inferences from it that are consistent
> with the verdict. This rule requires the trial court judge to
> resolve all evidentiary conflicts and credibility questions in the
> prosecution's favor; moreover, as among competing inferences

---

[14]In footnote twenty-four of *Guthrie*, this Court identified examples of the types of evidence properly supporting a finding of first degree murder, stating that "[t]hese examples are illustrative only and are not intended to be exhaustive." 194 W.Va. at 676 n.24, 461 S.E.2d at 182 n.24. The identified categories included the following:

> (1) "planning" activity-facts regarding the defendant's behavior prior to the
> killing which might indicate a design to take life; (2) facts about the
> defendant's prior relationship or behavior with the victim which might indicate
> a motive to kill; and (3) evidence regarding the nature or manner of the killing
> which indicate a deliberate intention to kill according to a preconceived
> design.

*Id.*

24

of which two or more are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt.

With specific reference to evidence regarding premeditation, this Court has previously analyzed the nature of such evidence, explaining that "[m]alice or premeditation need not exist for any great length of time before the homicide." *State v. Burdette*, 135 W.Va. 312, 331, 63 S.E.2d 69, 81 (1950). The issue of sufficiency of evidence of premeditation was addressed extensively by Justice Cleckley in syllabus points five and six of *Guthrie*:

> Although premeditation and deliberation are not measured by any particular period of time, there must be *some period between the formation of the intent to kill and the actual killing*, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed.

> In criminal cases where the State seeks a conviction of first degree murder based on premeditation and deliberation, a trial court should instruct the jury that murder in the first degree consists of an intentional, deliberate, and premeditated killing which means that *the killing is done after a period of time for prior consideration. The duration of that period cannot be arbitrarily fixed.* The time in which to form a deliberate and premeditated design varies as the minds and temperaments of people differ and according to the circumstances in which they may be placed. *Any interval of time* between the forming of the intent to kill and the execution of that intent, which is of sufficient duration for the accused to be fully conscious of what he intended, is sufficient to support a conviction for first degree murder.

194 W.Va. at 664, 461 S.E.2d at 170 (emphasis supplied). In *LaRock*, this Court recognized

that, "[a]s a practical matter, premeditation generally can be proved only by circumstantial

evidence." 196 W.Va. at 305, 470 S.E.2d at 624. Direct proof of premeditation is "seldom

possible" due to the reality that a "defendant's mental processes are wholly subjective." *Id*.

The *LaRock* Court explained:

> If premeditation is found, it must ordinarily be inferred from the
> objective facts. Accordingly, if one voluntarily does an act, the
> direct and natural tendency of which is to destroy another's life,
> it fairly may be inferred, in the absence of evidence to the
> contrary, that the destruction of that other's life was intended.

*Id*.

In his brief to this Court on the issue of sufficiency of the evidence, Mr.

Blevins asserts that "the State could offer no witness who could claim 'I saw [the petitioner]

do it' nor could it produce evidence of the plan to kill, motive to kill, or deliberate intent to

kill." While the assertion that no eyewitness observed the actual commission of this heinous

crime is quite correct, it is equally evident, as this Court has recognized on multiple

occasions and in varied contexts, that direct proof of premeditation is "seldom possible" and

that premeditation generally can be proved only by circumstantial evidence." *Id*.

The State contends that the jury was legally entitled to infer that Mr. Blevins

had sufficient time to reflect on his actions as he severely beat one victim to death in one

26

location and then beat another victim to death in a different location. Detective Combs of the Mercer County Sheriff's Department testified regarding the extensive injuries to the victims, explaining that he had observed the body of Mrs. Barton with what appeared to be severe head injuries. He took possession of a piece of a baseball bat which was found near her body. Further, Detective Combs discovered the severely beaten body of Mr. Barton locked inside the storage building. Detective Combs observed significant blood spatter around Mr. Barton's body and testified that he located a hatchet and a crowbar near the body. Detective Combs also observed what appeared to be blood on the crowbar and a large pool of blood in the entryway of the Barton residence. Corporal Sommers likewise testified that he observed the body of Mrs. Barton lying in the yard with severe lacerations to her head and extending over part of her ear. Inside the home, Corporal Sommers observed an extensive pool of blood and a fragment of a baseball bat.

Based upon the evidence presented, this Court finds no error in the conclusion that the evidence was sufficient to support the jury's finding of premeditation and deliberation, and we affirm the circuit court's conclusions in that regard.

F. Tainted Photographic Array and Use of John Reed's Eyewitness Testimony

Mr. Blevins contends that the circuit court erred in permitting a tainted photographic array in the identification of Mr. Blevins by the Bartons' neighbor, Mr. Reed.

The record reveals that John Reed described the person he saw in the neighborhood on the morning of the murder as a "shorter" white male in his mid-twenties, with dark hair and a medium to stocky build with tattoos on his neck. Mr. Blevins contends that the photographic array used to identify him was impermissibly suggestive based upon the fact that Mr. Blevins was the only individual with tattoos,[15] of shorter statue, and depicted up against a wall marked to show height.

In addressing the identification of Mr. Blevins by Mr. Reed, the State notes that Mr. Reed had ample time to observe Mr. Blevins, as the two had an extensive conversation of five to ten minutes on the morning of the murders. Mr. Reed was able to give the police a detailed and accurate description of Mr. Blevins and his automobile, prior to being asked to identify an individual in a photographic array. The circuit court noted that five of the six individuals in the photographic array looked quite similar.

In analyzing whether an out-of-court identification is sufficiently tainted to require suppression of an in-court identification, this Court has emphasized the need to

---

[15]Testimony introduced at trial indicated that the photo utilized in the array covered Mr. Blevins' tattoos to the extent possible, resulting in a dark spot under the neck. One of the other individuals in the photographic array also had a dark smudge at the neck. Captain Gills testified that the police had attempted to assemble an array of similar photographs.

28

examine the totality of the circumstances. In syllabus point three of *State v. Casdorph*, 159 W.Va. 909, 230 S.E.2d 476 (1976), this Court explained:

> In determining whether an out-of-court identification of a defendant is so tainted as to require suppression of an in-court identification a court must look to the totality of the circumstances and determine whether the identification was reliable, even though the confrontation procedure was suggestive, with due regard given to such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

In syllabus point six of *State v. Harless*, 168 W.Va. 707, 285 S.E.2d 461 (1981), this Court stated that "[m]ost courts have concluded that a photographic array will not be deemed excessively suggestive as long as it contains some photographs that are fairly representative of the defendant's physical features. The fact that some of the photographs are dissimilar to the defendant's appearance will not taint the entire array."

In the present case, Mr. Reed had ample opportunity to observe Mr. Blevins in direct conversation with him for at least five minutes. Mr. Reed's description of Mr. Blevins was extremely accurate, and he identified Mr. Blevins in the photographic array the same day he had seen him in person. The police did not make any suggestions to Mr. Reed regarding which photograph to select, and his identification of Mr. Blevins was immediate and certain. Mr. Reed's in-court identification was similarly immediate and certain.

29

Although not all of the individuals in the photograph had tattoos and several were taller than Mr. Blevins, we do not find that the identification process was improperly tainted or that the photographic array was unduly suggestive in any manner. The Court consequently affirms the findings of the circuit court in this regard.

### G. Confrontation Clause

#### 1. Autopsy Report and Testimony of Dr. Kaplan

Mr. Blevins contends that his fundamental constitutional right to confront the witnesses against him was violated by the introduction of the autopsy reports and the testimony of Dr. James Kaplan, Chief Medical Examiner for the State of West Virginia, in light of the fact that Dr. Kaplan had not performed the autopsies. Dr. Robert C. Belding, the individual who actually performed the autopsies and prepared the reports, had been terminated from the Medical Examiner's Office and had apparently chosen not to testify because the State refused to pay him the $2,536.00 he sought as a fee for such testimony.

The record indicates that the State first disclosed that Dr. Belding was no longer employed by the State Medical Examiner's Office during an April 9, 2010, motions hearing. At that time, the circuit court directed that Dr. Belding be subpoenaed. When Dr. Belding ultimately did not appear for trial, Mr. Blevins' counsel objected[16] to the testimony

---

[16]In his brief, Mr. Blevins assigns two separate errors regarding the Confrontation
(continued...)

of Dr. Kaplan, based upon the inability to cross-examine Dr. Belding regarding the autopsy reports.

Subsequent to an in camera meeting between the circuit court and Dr. Kaplan, the circuit court determined that Dr. Belding had not been terminated for any reason regarding his competence. In discussions with Mr. Blevins' counsel, the circuit court confirmed that Dr. Kaplan's testimony would be limited to the contents of the autopsy reports. Thereafter, Mr. Blevins' counsel withdrew his objection to the testimony of Dr. Kaplan in place of Dr. Belding, and the autopsy reports and Dr. Kaplan's testimony were admitted into evidence without further objection.[17]

The Confrontation Clause of the Sixth Amendment to the United States Constitution and section 14 of article III of the West Virginia Constitution guarantee the right

---

[16](...continued)
Clause issue. First, he addresses the primary contention that a Confrontation Clause violation occurred. Second, he asserts that despite his counsel's failure to adequately object to the Confrontation Clause violation, this Court should invoke the plain error doctrine. Due to the obvious connection between these two assignments of error, this Court addresses them together herein.

[17]Dr. Kaplan testified that Mrs. Barton died as a result of blunt force and sharp force injuries, sustaining fatal head and neck injuries, as well as multiple injuries to her body. Dr. Kaplan also explained that the autopsy reported indicated that Mrs. Barton suffered a skull fracture and multiple blows to her face, consistent with blows which could be inflicted by a baseball bat. She had eight stab wounds, seven of which were inflicted upon her head and neck. Dr. Kaplan explained that the autopsy report indicated that Mr. Barton exhibited four chop force injuries sustained by the use of a hatchet-like weapon.

31

of a criminal defendant to confront and cross-examine witnesses against him. In *State v. Mechling*, 219 W.Va. 366, 633 S.E.2d 311 (2006), this Court held that the Confrontation Clause prohibits introduction of "testimonial statements" of witnesses who do not appear at trial. *Id.* at 373, 633 S.E.2d at 318. Exceptions to this general rule include a witness unavailable to testify where the defendant had a prior opportunity to cross-examine that individual. *Id.* Syllabus point six of *Mechling* provides as follows:

> Pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* bars the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness.

In *State v. Frazier*, 229 W.Va. 724, 735 S.E.2d 727 (2012), this Court addressed the Confrontation Clause within the context of a situation extremely similar to the present case. In *Frazier*, Dr. Kaplan testified at Mr. Frazier's trial despite the fact that Dr. Belding had performed the autopsy report on the alleged victim in that case. *Id.* at ___, 735 S.E.2d at 730. Upon Mr. Frazier's assertion that a Confrontation Clause violation had occurred, this Court concluded, and the State conceded, that an autopsy report is a testimonial statement and that "it was error for the trial court to admit into evidence the autopsy report and to permit Dr. Kaplan to testify as a surrogate witness." *Id*. at ___, 735 S.E.2d at 732. This Court's decision in *State v. Kennedy*, 229 W.Va. 756, 735 S.E.2d 905 (2012) is also

consistent with the *Frazier* holding. In *Kennedy*, this Court found that the testimony of the pathologist who did not perform the autopsy was violative of the Confrontation Clause to the extent that he served as a transmitter for the opinions of the non-testifying pathologist who had prepared the autopsy. *Id*. at ___, 735 S.E.2d at 921; *see also Bullcoming v. New Mexico*, 564 U.S. ___ (2011) (finding that laboratory report certified by nontestifying analyst indicating defendant's blood-alcohol level was testimonial in nature); *Melendez–Diaz v. Massachusetts*, 557 U.S. 305 (2009) (viewing certificates of analysis prepared by nontestifying analysts stating that substance seized was cocaine as testimonial statements).

In its brief, the State concedes that "it would appear as if to permit the testimony of Dr. Kaplan was error." The State argues, however, that any error was harmless. Further, the State contends that defense counsel waived the objection to that error by withdrawing it prior to the testimony of Dr. Kaplan. We consequently address the issue of plain constitutional error prior to addressing the State's assertion that any error was harmless.

2. Plain Error Analysis

Within the specific realm of constitutional error, this Court has held that "[a]lleged errors of a constitutional magnitude will generally trigger a review by this Court under the plain error doctrine." *State v. Salmons*, 203 W.Va. 561, 571 n.13, 509 S.E.2d 842, 852 n.13 (1998). Similarly, in syllabus point four of *State v. Starr*, 158 W.Va. 905, 216 S.E.2d 242 (1975), this Court explained: "Although it is a well-settled policy that the

33

Supreme Court of Appeals normally will not rule upon unassigned or imperfectly assigned errors, this Court will take cognizance of plain error involving a fundamental right of an accused which is protected by the Constitution."

In *LaRock*, this Court enumerated the prerequisites for the application of the plain error doctrine, as follows:

> To satisfy the plain error standard, a court must find: (1) there was error in the trial court's determination; (2) the error was plain or obvious; and (3) the error affected "substantial rights" in that the error was prejudicial and *not harmless*. 194 W.Va. at 18, 459 S.E.2d at 129, citing *United States v. Olano*, 507 U.S. 725, 730-732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508, 518 (1993).

196 W.Va. at 316-17, 470 S.E.2d at 635-36 (emphasis supplied).

These prior holdings of this Court on the issue of plain constitutional error indicate the necessity for review of errors of consitutional magnitude. The introduction of Dr. Kaplan's testimony clearly constituted a violation of the Confrontation Clause and was erroneous under the principles most recently discussed in *Frazier* and *Kennedy*. Consequently, despite the withdrawal of defense counsel's objection to the testimony of Dr. Kaplan, this Court finds that the circuit court committed error in the case *sub judice* and that Mr. Blevins' constitutional right to confront the witnesses against him was indeed violated.

3. Harmless Error

34

The State maintains that introduction of Dr. Kaplan's testimony constitutes harmless error. The State emphasizes the extensive evidence against Mr. Blevins and asserts that the evidence presented through the testimony of Dr. Kaplan did not affect the jury's verdict of guilt. In *Mechling*, this Court reiterated the principle that violation of a constitutional right constitutes reversible error unless that error is *harmless beyond a reasonable doubt*. 219 W.Va. at 371, 633 S.E.2d at 316. In syllabus point five of *State ex rel. Grob v. Blair*, 158 W.Va. 647, 214 S.E.2d 330 (1975), this Court stated that the "[f]ailure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt." *See also State v. Jenkins*, 195 W.Va. 620, 629, 466 S.E.2d 471, 480 (1995). Most recently, in syllabus point three of *Frazier*, this Court explained that "[i]n a criminal case, the burden is upon the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 229 W.Va. at 725, 735 S.E.2d at 728.[18]

Courts assessing the harm arising from the introduction of evidence violating the Confrontation Clause have focused upon whether the information gleaned by the jury

---

[18]Likewise, in *Morrison v. Holland*, 177 W.Va. 297, 352 S.E.2d 46 (1986), this Court stated that "[u]nder the harmless constitutional error doctrine, the State's burden is to show 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" 177 W.Va. at 301, 352 S.E.2d at 51 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). In syllabus point twenty of *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974), this Court held that "[e]rrors involving deprivation of constitutional rights will be regarded as harmless only if there is no reasonable possibility that the violation contributed to the conviction."

through such evidence contributed to the verdict or addressed a critical issue involving conflicting and pivotal evidence at trial. In assessing the harmless error issue in the present case, the State emphasizes that the circuit court inquired of Mr. Blevins' counsel on multiple occasions regarding whether there was any real question of how the victims had died. Mr. Blevins' counsel responded by stating that there was no dispute regarding the cause of death. Of critical import to this examination is the fact that nothing in the autopsy reports implicated Mr. Blevins in the murders; Dr. Kaplan's testimony did not contain any element incriminating Mr. Blevins in any manner. Additionally, the severity of the injuries sustained by the victims was established *not only* by the autopsy reports, but also by the direct testimony of the first responders to the crime scene.

In *Frazier*, this Court found that the error of admitting Dr. Kaplan's testimony was not harmless because the autopsy addressed the critical issue of the angle of the fatal wound.

> The prosecution's theory of the case was that the angle of the shotgun blast was inconsistent with the defendant's claim of an accidental shooting. Dr. Kaplan was not offering his own conclusions as to what the angle was, but was repeating Dr. Belding's findings on that key issue. This effectively denied the defendant his right to confront Dr. Belding about his conclusions.

*Frazier*, 229 W.Va. at ___, 735 S.E.2d at 733 (footnote omitted). Consequently, because the autopsy report in *Frazier* addressed a critical element that was contested by the parties, this Court found that the error was not harmless. Justice Benjamin dissented in *Frazier*,

36

explaining that he would consider the constitutional error regarding the Confrontation Clause harmless beyond a reasonable doubt. *Id.* at ___, 735 S.E.2d at 734 (Benjamin, J., dissenting). "I disagree with the majority opinion because I believe that Dr. Kaplan's testimony and the autopsy report added nothing to the State's evidence against the petitioner, and that there is no contradiction between Dr. Belding's clinical summary and his autopsy report." *Id.*

In harmless error analyses undertaken by various other jurisdictions in conjunction with violations of the Confrontation Clause, courts have been cognizant of the nature of the harm within each individual factual and evidentiary circumstance. In *Perkins v. State*, 897 So.2d 457 (Ala. Crim. App. 2004), for instance, the Court of Criminal Appeals of Alabama noted that violations of the defendant's right to confront witnesses against him are subject to a harmless error analysis and that a conclusion that the error was harmless would result where "[e]ven without the autopsy report, the evidence presented by the State was sufficient on which to base a finding that [the defendant] was guilty of capital murder." *Id.* at 465. The court reasoned that "[a]dmission of the autopsy report through the testimony of Howard and Glenn did not affect the jury's conclusion that Perkins killed Wysteria Mathews. The admission of the report, even if error, was harmless beyond a reasonable doubt. Thus, no basis for reversal exists as to this issue." *Id.*

A defendant's right to confrontation in conjunction with the trial court's admission of transcripts of grand jury testimony of nontestifying codefendants was addressed

in *Corado v. Commonwealth*, 623 S.E.2d 452 (Va. Ct. App. 2005).  In that case, the Court of Appeals of Virginia reasoned that it would consider whether "'erroneous admission of evidence was sufficiently prejudicial to require reversal on the basis of our own reading of the record and on what seems to us to have been the probable impact on the fact finder.'" 623 S.E.2d at 456  (quoting *Green v. Commonwealth*, 528 S.E.2d 187, 191 (Va. Ct. App. 2000)).  The court ultimately determined that the challenged evidence was not dispositive and that the jury would have convicted the defendant even in the absence of the challenged testimony.  623 S.E.2d at 457.

Similarly, in *Wood v. State*, 299 S.W.3d 200 (Tex. Ct. App. 2009), the Court of Appeals of Texas decided the issue of whether disclosure of testimonial statements constituted reversible error by considering "how important the statements were to the State's case, whether the statements were cumulative of other evidence, the presence or absence of evidence corroborating or contradicting the out-of-court statements on material points, and the overall strength of the prosecution's case."  *Id.* at 215.  After undertaking such evaluation, the *Wood* court was "satisfied beyond a reasonable doubt that disclosure of this testimonial statement did not contribute to the appellant's conviction."  *Id.*[19]

---

[19]The *Wood* court explained its reasoning as follows:

> The autopsy report in question was a testimonial statement and the medical examiner who conducted the autopsy and prepared the report was a witness within the meaning of the Confrontation Clause as construed in

(continued...)

In the present case, this Court's analysis of the State's contention that the error of admitting Dr. Kaplan's testimony was harmless beyond a reasonable doubt includes an examination of the record for any indication that Dr. Kaplan's testimony could have influenced the jury's verdict. Dr. Kaplan's testimony, essentially a recitation of Dr. Belding's findings, revealed nothing incriminating.[20] Nothing contained in Dr. Kaplan's testimony rendered it more or less likely that Mr. Blevins committed the murders; similarly, nothing in his testimony revealed any detail that the jury did not hear during the testimony of other witnesses. The severity of the fatal beatings was apparent from other admissible testimony, and nothing in Dr. Kaplan's testimony linked Mr. Blevins to the crime. The most damaging element to Dr. Kaplan's testimony was his reiteration of the nature of the offenses

---

[19](...continued)
*Crawford* and *Melendez–Diaz*. Under the circumstances of this case, the use before the jury of the contents of the autopsy report violated appellant's right of confrontation. Beyond a reasonable doubt, however, the error did not contribute to appellant's conviction or punishment.

299 S.W.3d at 215-16.

[20]A discussion regarding the accusatory nature of the autopsy report testimony informs only our analysis of the harmless nature of the Confrontation Clause error. This discussion in no way bears upon the issue of whether of not the autopsy report is testimonial for purposes of analyzing the Confrontation Clause error. *See Kennedy*, 229 W.Va. at ___, 735 S.E.2d at 909, syl. pt.6 ("To the extent that W. Va. Code § 61–12–13 (Repl. Vol. 2010) compels the mandatory admission of an autopsy report or other testimonial document, in a criminal action, where the performing pathologist or analyst does not appear at trial and the State fails to establish that the pathologist or analyst is unavailable and that the accused has had a prior opportunity to cross-examine the witness, it is unconstitutional and unenforceable.").

committed.[21] This component was, in many respects, duplicative of other evidence the jury had heard. Thus, in contrast to the situation this Court encountered in *Frazier*, wherein the challenged evidence directly addressed a contested fact which could have been dispositive of the question of guilt, this Court concludes that the State in the present case satisfied its burden of proving beyond a reasonable doubt that the disclosure of the information contained in the autopsy reports and explained by Dr. Kaplan did not contribute to Mr. Blevins' conviction or punishment.

### H. Proportionality of Sentence

Mr. Blevins contends that his sentence is disproportionate to the offenses committed and violates the proportionality principle enunciated in article III, section 5 of the West Virginia Constitution, which disallows sentences which are not proportionate to the character and degree of the offenses committed. In addressing this issue, Mr. Blevins asserts that the jury was never provided with the opportunity to be "introduced" to Mr. Blevins or to have any background knowledge about him personally. The State responds by asserting that the penalty for murder in the first degree is precisely what Mr. Blevins received, life in

---

[21]In *Wood*, for example, the court addressed the erroneous introduction of autopsy evidence and observed as follows: "The fact that Wessberg [the victim] had twenty-one rib fractures was a detail that may have added some weight to the State's case, but it was hardly critical." 299 S.W.3d at 215.

the penitentiary, and that the determination concerning a potential recommendation of mercy is entirely within the province of the jury.

This Court examined the issue of proportionality of sentence in *State v. Cooper*, 172 W.Va. 266, 304 S.E.2d 851 (1983), and held as follows in syllabus point five:

> Punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity, thereby violating *West Virginia Constitution, Article III[,] Section 5* that prohibits a penalty that is not proportionate to the character and degree of an offense.

This Court further explained the *Cooper* model as follows:

> The first [test] is subjective and asks whether the sentence for the particular crime shocks the conscience of the court and society. If a sentence is so offensive that it cannot pass a societal and judicial sense of justice, the inquiry need not proceed further. When it cannot be said that a sentence shocks the conscience, a disproportionality challenge is guided by the objective test we spelled out in Syllabus Point 5 of *Wanstreet v. Bordenkircher*, 166 W.Va. 523, 276 S.E.2d 205 (1981):
>
> > In determining whether a given sentence violates the proportionality principle found in *Article III, Section 5 of the West Virginia Constitution*, consideration is given to the nature of the offense, the legislative purpose behind the punishment, a comparison of the punishment with what would be inflicted in other jurisdictions, and a comparison with other offenses within the same jurisdiction.

172 W.Va. at 272, 304 S.E.2d at 857.

41

In this case, Mr. Blevins was sentenced to the maximum punishment provided by the West Virginia Legislature for first degree murder. The jury was properly instructed regarding its prerogative to consider a recommendation of mercy, and it chose not to do so. This Court finds no legitimate basis upon which Mr. Blevins can challenge the punishment received in this case. In consideration of the nature of the offenses committed, this Court cannot conclude that the punishment imposed upon him shocks the conscience or in any manner violates the proportionality principles contained in article III, section 5 of the West Virginia Constitution.

## IV. Conclusion

For the foregoing reasons, this Court affirms Mr. Blevins' convictions for two counts of first degree murder and one count of first degree arson in the Circuit Court of Mercer County, as well as the sentences imposed.

Affirmed.