IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2021 Term

_____

No. 20-0175

_____

IN RE: C.B.

FILED
October 29, 2021
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Appeal from the Circuit Court of Fayette County
The Honorable Paul M. Blake, Jr., Judge
Civil Action No. 19-JD-18

AFFIRMED

Submitted: September 28, 2021
Filed: October 29, 2021

James Adkins, Esq.
Public Defender Corp. 12th Jud. Circ.
Fayetteville, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Katherine M. Smith, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent
The State of West Virginia

JUSTICE ARMSTEAD delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1. "'Pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* bars the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness.' Syl. Pt. 6, *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006)." Syl. Pt. 19, *State v. Blevins*, 231 W. Va. 135, 744 S.E.2d 245 (2013).

2. "'Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt.' Syl. Pt. 5, *State [ex rel Grob] v. Blair*, 158 W. Va. 647, 648, 214 S.E.2d 330, 331 (1975)." Syl. Pt. 11, *State v. Barefield*, 240 W. Va. 587, 814 S.E.2d 250 (2018).

3. "'A motion for continuance is addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless there is a showing that there has been an abuse of discretion.' Syl. pt. 2, *State v. Bush*, 163 W. Va. 168, 255 S.E.2d 539 (1979)." Syl. Pt. 2, *State v. Jason H.*, 215 W. Va. 439, 599 S.E.2d 862 (2004).

4. "The preliminary issue of whether a sufficient chain of custody has been shown to permit the admission of physical evidence is for the trial court to resolve.

Absent abuse of discretion, that decision will not be disturbed on appeal." Syl. Pt. 2, *State v. Davis*, 164 W. Va. 783, 266 S.E.2d 909 (1980).

5.     "Where the findings of fact and conclusions of law justifying an order transferring a juvenile proceeding to the criminal jurisdiction of the circuit court are clearly wrong or against the plain preponderance of the evidence, such findings of fact and conclusions of law must be reversed. W. Va. Code, 49-5-10(a) [1977] [now 2001] [now codified as § 49-4-710 (2015)]." Syl. Pt. 1, *State v. Bannister*, 162 W. Va. 447, 250 S.E.2d 53 (1978).

6.     "'Before transfer of a juvenile to criminal court, a juvenile court judge must make a careful, detailed analysis into the child's mental and physical condition, maturity, emotional attitude, home or family environment, school experience and other similar personal factors.' W. Va. Code 49-5-10(d) [now W. Va. Code § 49-4-710(f) and (g)]." Syl. Pt. 2, *State v. Sonja B.,* 183 W. Va. 380, 395 S.E.2d 803 (1990).

ARMSTEAD, JUSTICE:

This matter involves the transfer of a juvenile delinquency petition to the criminal jurisdiction of the Fayette County Circuit Court. The juvenile, C.B.,[1] (hereinafter "Petitioner") was seventeen years and seven months old when he was charged with child abuse resulting in serious bodily injury and child neglect resulting in serious bodily injury.[2] Following the filing of the delinquency petition against Petitioner, the State of West Virginia moved to transfer the case to the criminal jurisdiction of the circuit court pursuant to West Virginia Code § 49-4-710 (2015). Following a hearing, the circuit court granted the State's motion and transferred the case to its adult criminal jurisdiction.

On appeal, Petitioner argues that the circuit court erred in transferring the case. He requests that this Court reverse and remand the case to the juvenile jurisdiction of the circuit court.

Upon careful review of the briefs of the parties, the appendix record, the arguments of the parties, and the applicable legal authority, we find no error in the circuit court's conclusion that this matter should have been transferred to its adult criminal jurisdiction. Accordingly, we affirm the circuit court's order.

---

[1] As in all cases involving sensitive facts and minor children, we use initials and titles to identify the parties. *See* W. Va. R. App. Proc. 40(e); *State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

[2] Petitioner was alleged to have committed these acts against his then seven-week old infant son.

## I. FACTS AND PROCEDURAL HISTORY

On the evening of September 3, 2019, Corporal J.W. Keffer of the West Virginia State Police was called to Raleigh General Hospital in Beckley, West Virginia due to injuries sustained by a seven-week-old infant.[3] The infant was transported to the hospital by his father, the Petitioner, and the mother of the child who was Petitioner's significant other. It is alleged that they brought their child to the hospital because of swelling in the infant's right leg and also because the infant had been crying uncontrollably for at least five hours. There was no call for emergency medical services during the five hours after Petitioner and the infant's mother noticed a problem with his child's leg despite the infant's uncontrollable crying. Upon arriving at Raleigh General Hospital, Cpl. Keffer was informed by Nurse Diehl that the infant had rib fractures and a broken leg. Further, he was informed that the infant was being transferred to CAMC Women and Children's hospital for further treatment.

The following day, September 4, 2019, Cpl. Keffer conducted *Mirandized*[4] interviews of Petitioner and the mother of the infant. During the interview with Petitioner and while discussing the infant's rib injuries, Petitioner reported that he would sometimes

---

[3] A Beckley Police Officer initially responded to the hospital, but after discovering that the crime occurred outside of his jurisdiction, he contacted the West Virginia State Police.

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

2

get frustrated and may have squeezed the baby too hard.[5]  He also reported that he believed the baby's leg was broken when he (Petitioner) rolled off a bed and landed on top of the baby while he was sleeping with the baby on his chest.  Petitioner also stated that he had smoked marijuana earlier in the day.  At some point thereafter, he and the infant took a nap in bed, and according to Petitioner, he rolled from the bed onto the floor on top of the baby.  After falling on his baby, Petitioner stated that the baby's leg appeared to be at an odd angle.

The mother of the infant denied being at home when the baby's injury occurred.  However, after arriving home, she thought that the baby may have been injured so she and Petitioner called Petitioner's mother, but she could not come home immediately.  Therefore, despite noticing that the baby's leg was swelling around 2:00 p.m., Petitioner and the mother of the infant waited until Petitioner's mother arrived home hours later before they took the baby to the hospital.  After speaking with Petitioner and the mother of the infant, Cpl. Keffer spoke to Dr. Joan Phillips, M.D. who assessed the infant at CAMC Women and Children's Hospital.  Dr. Phillips informed Cpl. Keffer that the infant had six healing rib fractures as well as fractures of the right distal femur and the right proximal tibia and a possible left distal femur fracture.  In addition, Dr. Phillips noted that the infant had bruising on his right lower leg, left shoulder, upper left arm and left buttock.

---

[5] Petitioner advised that he would become frustrated because the baby was colicky.

3

On October 8, 2019, Cpl. J.W. Keffer of the West Virginia State Police filed a juvenile petition, alleging that Petitioner was a delinquent child. In the petition, he claimed that between August 25, 2019, and September 3, 2019, Petitioner committed the offenses of child abuse resulting in serious bodily injury[6] by using excessive physical force on his infant son and child neglect resulting in serious bodily injury[7] by "failing to provide necessities such that [the infant] was malnourished and dehydrated, and failing to seek medical attention" for the infant. At the time the petition was filed, Petitioner was seventeen years old, and his son was approximately seven weeks old. The infant's mother was thirty-four or thirty-five years old. Petitioner, the infant, the infant's mother, and Petitioner's mother lived together in Petitioner's mother's home.

On or about November 7, 2019, the State filed a motion to transfer Petitioner's juvenile proceedings to the circuit court's criminal jurisdiction. The State

---

[6] *See* W. Va. Code § 61-8D-3(b) ("If any parent, guardian or custodian shall abuse a child and by such abuse cause said child serious bodily injury as such term is defined in section one, article eight-b of this chapter, then such parent, guardian or custodian shall be guilty of a felony and, upon conviction thereof, shall be fined not less than $1,000 nor more than $5,000 and committed to the custody of the Division of Corrections not less than two nor more than ten years."); *see also* W. Va. Code § 61-8B-1(10) ("'Serious bodily injury' means bodily injury which creates a substantial risk of death, which causes serious or prolonged disfigurement, prolonged impairment of health or prolonged loss or impairment of the function of any bodily organ.").

[7] *See* W. Va. Code § 61-8D-4(b) ("If a parent, guardian or custodian neglects a child and by such neglect cause the child serious bodily injury, as serious bodily injury is defined in section one, article eight-b of this chapter, then the parent, guardian or custodian is guilty of a felony and, upon conviction thereof, shall be fined not less than $300 nor more than $3,000 dollars or imprisoned in a state correctional facility for not less than one nor more than ten years, or both."); *see also* W. Va. Code § 61-8B-1(10) (quoted *supra* note 6).

asserted that probable cause existed to believe that Petitioner committed the offenses set forth in the juvenile petition and that there was "clear and convincing evidence based on [Petitioner's] mental and physical condition, maturity, emotional attitude, home or family environment, school experience and similar personal factors" to transfer this matter to the criminal jurisdiction of the circuit court.

On November 22, 2019, the parties appeared for a transfer hearing, but the State was unprepared to proceed. The State requested a short continuance so that it could provide full discovery to Petitioner. Petitioner objected, arguing that good cause did not exist for the continuance. By order entered on December 4, 2019, the circuit court granted the State's motion for a continuance, finding that good cause existed.

The parties reconvened for the transfer hearing on December 18, 2019. Petitioner renewed his objection to the previously granted continuance. The circuit court overruled the objection. The court went on to hear testimony from Cpl. Keffer, the investigating officer; Judy Lively, the Attendance Director of the Fayette County Board of Education; and Chad Quesenberry, Assistant Principal of Oak Hill High School.

Cpl. Keffer testified that his investigation of the matter began with the receipt of a report of a possible child abuse case at Raleigh General Hospital. Cpl. Keffer was questioned by the State's counsel as follows:

Q.    Okay. When you arrived at Raleigh General Hospital did you speak with anybody?

A.    Initially I spoke with the nurse, Ashley Diehl.

Q.    Okay. And what was -- what was conveyed to you when you spoke with Ms. Diehl?

A.    When I spoke to her she basically gave me the rundown that --

[Petitioner's counsel]: I'm going to object to hearsay, Your Honor.

THE COURT: I'll overrule it. I think it goes to show why he took the actions that he took later on. It's not assertive for the truth of the matter serving just for the -- showing what he -- his conduct -- what led to his conduct.  Go ahead.

Q.    Okay. What she, I guess, did she give a time when -- when the family arrived at the hospital?

A.    It was approximately 7:00, a little after 7:00 that evening. She explain [sic] that they went through and said that around 2:00 that they noticed the baby's leg and he was crying uncontrollably and I think they advised they had to wait until later that evening until the mother arrived -- they didn't have a ride.

. . . .

Q. Okay. Did the nurse, nurse Diehl, give a status update on the condition of the [infant]?

A. Yeah, she advised that they had found some broken ribs that appeared to be healing and a broken leg, a right leg at that time

6

they determined they were going to send the baby to see CAMC Women's and Children's.

Cpl. Keffer testified that the following day, he spoke with Petitioner and the mother of the infant. Upon advising them of their *Miranda* rights, they both made statements to Cpl. Keffer. When asked whether Petitioner gave "a statement in terms of what he believed the injuries to the child were," Cpl. Keffer testified:

> The leg injury, he stated that he believed that he was sleeping with the baby on his chest and he fell from the bed into the floor on top of the baby, which is what he believed broke the baby's leg.
>
> When I inquired about the rib injuries, he stated that sometimes he would get frustrated and may have squeezed the baby too hard.

Cpl. Keffer further testified that Petitioner told him that on the day he and his girlfriend, who is the infant's mother, took the infant to the hospital, Petitioner had smoked marijuana earlier in the day, and his girlfriend arrived home at approximately 2:00 p.m., which was when they observed the infant's leg to be swollen. According to Cpl. Keffer, Petitioner and his girlfriend contacted Petitioner's mother who could not come home immediately. Petitioner claimed his mother's delay prevented him from bringing the infant to the hospital earlier. Cpl. Keffer also testified as to the infant's mother's statement, over Petitioner's objection. Cpl. Keffer testified that the girlfriend stated that she was not home during the time the injury occurred and that she noticed the injury upon arriving home.

7

Cpl. Keffer testified that after he interviewed Petitioner and the infant's mother, he spoke with Dr. Joan Phillips, a physician at CAMC. The State asked Cpl. Keffer, "[W]hat was [Dr. Phillips's] assessment of [Petitioner]?" and Petitioner made the following objection: "Objection, hearsay in competition."[8] The circuit court overruled the objection, and Cpl. Keffer testified as follows concerning his discussion with Dr. Phillips:

> Basically, she confirmed that there were broken ribs, more than what was initially determined. And I believe she said there were six and a femur and a tibia and she suspected possibly in the left leg a femur also.
>
> . . . .
>
> She had asked about what [Petitioner] stated and I said, well you know, he said maybe he squeezed the baby to [sic] tight. She advised that could have happened -- could have caused the rib injuries.
>
> I explained to her what he said occurred -- what he believed hurt the baby's leg. And she said, no the fracture -- she called it was a metaphyseal fracture. She said that -- the two ways that have occurred was by holding the baby with his legs unsupported and shaking the baby or grabbing the baby and jerking the leg. She said a fall would not have caused those injuries.
>
> . . . .
>
> . . . She said all the injuries that were noted on the baby were healing. They didn't occur the day that they went to the ER. She said they occurred approximately seven days prior. She

---

[8] *See supra* n.7.

couldn't put an exact time frame but she advised all the injuries were healing.

. . . .

She advised [the infant] was somewhat dehydrated. They gave him fluids and things.

Cpl. Keffer testified that after he spoke with Dr. Phillips, he conducted a second *Mirandized* interview of Petitioner. Cpl. Keffer said, "I explained to him that the doctor didn't agree with the way that the baby's leg was hurt; and at that time he said well, I told you, I probably shook the baby too hard."

Judy Lively, Attendance Director for the Fayette County Board of Education, testified that she interacted with Petitioner concerning truancy. Petitioner objected to her testimony, arguing that her testimony was irrelevant because "several months" had passed "between him leaving the school system altogether and these alleged offenses" and because "[n]one of these offenses are alleged to it incurred [sic] on school property or during school activities." The circuit court overruled the objection, and Ms. Lively went on to state that before Petitioner dropped out of school on his seventeenth birthday, he had truancy problems in tenth grade and eleventh grade, that he had discipline problems, that his academic performance was poor, and that there was nothing the school could have done to help him stay in school. When asked whether she was aware of whether Petitioner had any mental problems, she testified, "I was not aware of any mental problems." The State introduced six exhibits through Ms. Lively, consisting of Petitioner's Fayette County

9

Schools Official Withdrawal From School form (Exhibit 2), Fayette County Schools Withdrawal Application (Exhibit 3), Fayette County Schools Dropout Survey (Exhibit 4), Transcript Detail (Exhibit 5), Juvenile Summary Information (Exhibit 6), and Discipline Detail (Exhibit 7).

At the conclusion of Ms. Lively's testimony, Petitioner renewed his objection as to relevance due to the passage of time, and he argued that the "narrative of fights, disputes, disrespect whatever" was hearsay. The circuit court again overruled the objection and ordered that the State's exhibits be admitted into evidence for the purpose of the transfer hearing. However, Ms. Lively was accidently permitted to leave the courtroom with the exhibits. Petitioner objected, arguing, "[T]here is no chain of custody[.] . . . I object for them reappearing back in the record." The circuit court implicitly overruled the objection concerning chain of custody, responding:

> Well it's probably an oversight on the Court's part; I didn't get those exhibits from Ms. Lively. She has them in her file and the Court heard her testimony regarding those and so the State is directed to get those back from Ms. Lively this afternoon, placed [sic] them in the Circuit Clerk's file, in this matter, for further review.

The final witness to testify at the transfer hearing was Chad Quesenberry, Assistant Principal of Oak Hill High School. He testified that, following an incident on a school bus involving Petitioner and another student, Mr. Quesenberry suspended Petitioner from school and recommended that Petitioner be expelled; however, Petitioner withdrew

from school before he could be expelled. Mr. Quesenberry also testified that Petitioner had "a lot of insubordination, a lot of disrespectful issues that put him in my office," resulting in Petitioner being placed in alternative school "a couple of different times." Mr. Quesenberry explained that Petitioner's "demeanor with teachers and his attendance severely suffered[;] the longer he was with us the more it seemed to go downhill." Mr. Quesenberry further stated that Petitioner's mother "discuss[ed] not knowing what to do" with Petitioner. Mr. Quesenberry testified: "I think the older that [Petitioner] got and the longer he was with us, I don't think there was -- I don't think anyone had control over him. I think he was -- he had hit a point where he was out of control[.]" Mr. Quesenberry stated that he was unaware of Petitioner having any special needs or any severe learning disability.

By order entered February 19, 2020, the circuit court granted the State's motion to transfer Petitioner's juvenile proceedings to the court's criminal jurisdiction. The circuit court found that Petitioner was seventeen years old when the crimes were allegedly committed; that both of the charged crimes would be felonies if Petitioner had been an adult when they were committed; that Petitioner did not have a mental disorder, learning disability, or physical disability; that he had numerous absences; that he voluntarily withdrew from school after being offered an alternative program to help him graduate; that he failed almost all subjects during his last two years of school; that he had serious discipline problems consisting of violence and insubordination; that he "began an adult relationship with a woman much his senior"; that he cohabitated with his girlfriend in his

11

mother's residence; that his mother had no control over him; that he had been "behaving as an adult for some time"; that he admitted to using marijuana on the day the infant's injuries were discovered; and that "[i]t does not appear . . . that rehabilitative efforts afforded by the juvenile justice system would benefit [Petitioner]." Based on these findings, the court concluded:

> [T]here is probable cause to believe that [Petitioner] committed the crimes of "child abuse resulting in serious bodily injury" and "child neglect resulting in serious bodily injury." [Petitioner] admitted to law enforcement that he squeezed the infant and probably rocked or shook [the infant] too hard. [The infant] suffered numerous broken bones and a child abuse expert [Dr. Phillips] told the investigating officer that [the infant]'s injuries are child abuse, thus forming the basis for the enumerated charges in this matter.
>
> . . . .
>
> . . . [I]n consideration of the child's age, maturity, school history, family environment, [and] attitude, the [c]ourt believes that the [Petitioner] was sufficiently mature to understand the consequences of his actions at the time of the alleged crimes, and he was for all intents and purposes functioning as an adult.

Petitioner appeals the order transferring his juvenile case to the criminal jurisdiction of the circuit court.

## II. STANDARD OF REVIEW

Petitioner's four assignments of error have separate standards of review. With respect to Petitioner's claim of violation of his rights pursuant to the Confrontation Clauses of the federal and state constitutions, "it is well settled that a trial court's rulings

12

on the admissibility of evidence, 'including those affecting constitutional rights, are reviewed under an abuse of discretion standard.'" *State v. Kennedy*, 229 W. Va. 756, 763, 735 S.E.2d 905, 912 (2012) (quoting *State v. Kaufman*, 227 W. Va. 537, 548, 711 S.E.2d 607, 618 (2011)).

Petitioner also states that the circuit court erred when it continued his initial transfer hearing. "'A motion for continuance is addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless there is a showing that there has been an abuse of discretion.' Syl. pt. 2, *State v. Bush*, 163 W. Va. 168, 255 S.E.2d 539 (1979)." Syl. Pt. 2, *State v. Jason H.*, 215 W. Va. 439, 599 S.E.2d 862 (2004).

Petitioner complains that the circuit court erred by admitting certain exhibits after it retrieved them from a witness who accidentally took the exhibits when she left the courtroom after testifying. "The preliminary issue of whether a sufficient chain of custody has been shown to permit the admission of physical evidence is for the trial court to resolve. Absent abuse of discretion, that decision will not be disturbed on appeal." Syl. Pt. 2, *State v. Davis*, 164 W. Va. 783, 266 S.E.2d 909 (1980).

Petitioner's final argument is that the circuit court erred in transferring the case to its adult criminal jurisdiction without sufficient evidence regarding his prospects for rehabilitation through the juvenile justice system. "Where the findings of fact and conclusions of law justifying an order of transferring a juvenile proceeding to the criminal jurisdiction of the circuit court are clearly wrong or against the plain preponderance of the evidence, such findings of fact and conclusions of law must be reversed. W. Va. Code, 49-

13

5-10(a) [1977] [now 2001] [now codified as § 49-4-710 (2015)]." Syl. Pt. 1, *State v. Bannister*, 162 W. Va. 447, 250 S.E.2d 53 (1978).

### III. DISCUSSION

Petitioner was seventeen years old at the time his infant son was injured. For that reason, Petitioner was charged via a juvenile petition. After the circuit court granted the State's motion to transfer the juvenile proceedings to the adult criminal jurisdiction of the court, Petitioner filed the instant appeal. Petitioner argues that the circuit court erred in four distinct ways. Petitioner believes that the circuit court violated the Confrontation Clauses of the federal and state constitutions by allowing Cpl. Keffer to testify regarding statements made to him by medical personnel. In addition, Petitioner alleges that the circuit court erred by: (1) continuing the originally scheduled transfer hearing; (2) admitting exhibits that were removed from the courtroom; and (3) transferring his case without sufficient evidence of his prospects for rehabilitation and failing to enter a detailed order regarding his prospects for rehabilitation.

We begin our analysis with Petitioner's claim that the circuit court erred in admitting statements of medical personnel in violation of the Confrontation Clause of the 6th Amendment of the United States Constitution and Article III § 14 of the West Virginia Constitution.[9] In Syllabus Point 19 of *State v. Blevins*, 231 W. Va. 135, 744 S.E.2d 245, 252 (2013), this Court held:

---

[9] Article III, § 14 of the Constitution of West Virginia provides:

> "Pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Confrontation Clause contained within the Sixth Amendment to the *United States Constitution* and Section 14 of Article III of the *West Virginia Constitution* bars the admission of a testimonial statement by a witness who does not appear at trial, unless the witness is unavailable to testify and the accused had a prior opportunity to cross-examine the witness." Syl. Pt. 6, *State v. Mechling*, 219 W. Va. 366, 633 S.E.2d 311 (2006).

Petitioner argues that the Confrontation Clauses of the federal and state constitutions prohibit the admission of the statements of the medical personnel at his transfer hearing, as relayed by Cpl. Keffer, because neither witness appeared, and Petitioner did not previously have the opportunity to cross examine the witnesses.

It is undisputed that Nurse Diehl and Dr. Phillips did not appear at the transfer hearing which was held on December 18, 2019. Instead, Cpl. Keffer testified about statements made to him by Nurse Diehl and Dr. Phillips. Counsel for Petitioner objected to this testimony on the basis of hearsay and according to the transcript, "… hearsay in

---

Trials of crimes, and misdemeanors, unless herein otherwise provided, shall be by a jury of twelve men, public, without unreasonable delay, and in the county where the alleged offence was committed, unless upon petition of the accused, and for good cause shown, it is removed to some other county. In all such trials, the accused shall be fully and plainly informed of the character and cause of the accusation, and be confronted with the witness against him, and shall have the assistance of counsel, and a reasonable time to prepare for his defence; and there shall be awarded to him compulsory process for obtaining witnesses in his favor.

competition."[10]  However, because "hearsay in competition" appears to be a mistake, we will proceed as if the objection referenced the Confrontation Clause.[11]

The alleged Confrontation Clause violation is the admission of the statements of Nurse Diehl and Dr. Phillips that went to the "nature and causation of injury to the infant." The statements, in part, attributed to Nurse Diehl were that the baby had "broken ribs that appeared to be healing and a broken leg." The statements, in part, attributed to Dr. Phillips regarded the number of broken bones the infant had suffered as well as the manner in which the injuries could have occurred.

In prior cases addressing the Confrontation Clause, this Court has held that the testimony of medical professionals regarding autopsies that they did not perform was violative of the Confrontation Clause. In *State v. Kennedy*, 229 W. Va. 756, 735 S.E.2d 905 (2012), this Court found that the testimony of a pathologist who did not perform the autopsy of a victim was violative of the Confrontation Clause to the extent that the

---

[10] Counsel for Petitioner states that the actual objection was "Objection, hearsay, confrontation clause." Counsel also indicates that a motion to correct the transcript has been filed to make this correction.

[11] The State initially argues that the right to confrontation guaranteed by the Sixth Amendment and Article III, § 14 of the Constitution of West Virginia applies to trials, not transfer hearings. This is not the first time that this Court has been faced with this argument and rejected it. In *State v. Gary F.*, 189 W. Va. 523, 432 S.E.2d 793 (1993), this Court held that "[a] juvenile is denied his constitutional right to confront his accusers when a critical witness, who has not been demonstrated as unavailable pursuant to the rules of evidence, is permitted to testify by telephone during a transfer hearing." Syl. Pt. 3, *State v. Gary F.*, 189 W. Va. 523, 432 S.E.2d 793 (1993). We decline to revisit this issue in this case.

16

pathologist served as a transmitter for the opinions of the non-testifying pathologist who had prepared the autopsy. *Id.* at 771, 735 S.E.2d at 921. In *State v. Blevins,* 231 W. Va. 135, 744 S.E.2d 245 (2013), this Court found, and the State conceded, that the trial court erred in allowing the State's Chief Medical Examiner to testify regarding autopsy reports that he did not prepare.[12] In the present case, Cpl. Keffer transmitted the opinions of the non-testifying witnesses, Nurse Diehl and Dr. Phillips. Cpl. Keffer testified that both Nurse Diehl and Dr. Phillips advised him of the infant's injuries and the manner in which the infant's leg could have been injured. Although Petitioner cross-examined Cpl. Keffer during the transfer hearing, he was not afforded the opportunity to cross-examine either Nurse Diehl or Dr. Phillips. To the extent that Cpl. Keffer transmitted the opinions of Nurse Diehl and Dr. Phillips regarding the injuries and possible causes of such injuries, such testimony was violative of the Confrontation Clause. Nurse Diehl and Dr. Phillips' statements about the nature and possible cause of the infant's injuries, taken during Cpl. Keffer's investigation, were clearly testimonial. The United States Supreme Court has made it clear that only "'testimonial statements' cause [a] declarant to be a 'witness' subject to the constraints of the Confrontation Clause. Non-testimonial statements by an unavailable declarant, on the other hand, are not precluded from use by the Confrontation Clause." *State v. Mechling*, 219 W. Va. 366, 373, 633 S.E.2d 311, 318 (2006). When testimonial evidence is at issue, the United States Supreme Court has held that "the Sixth

---

[12] In *State v. Blevins,* Dr. Kaplan, the Chief Medical Examiner for the State of West Virginia testified about autopsies that were performed by Dr. Belding, a former employee of the State Medical Examiner's Office.

Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374, 158 L.Ed.2d 177 (2004). However, our analysis does not end here.

"'Failure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt.' Syl. Pt. 5, *State [ex rel. Grob] v. Blair*, 158 W. Va. 647, 648, 214 S.E.2d 330, 331 (1975)." Syl. Pt. 11, *State v. Barefield,* 240 W. Va. 587, 814 S.E.2d 250 (2018). Petitioner focuses his argument on the alleged improper admission of Nurse Diehl and Dr. Phillips' statements regarding the nature and causation of the injuries to his son. Despite the fact that such statements are violative of the right of confrontation, Petitioner's own statements to Cpl. Keffer admitting that his child was injured and how his actions resulted in the injuries to his child provide adequate proof to meet the statutory standard justifying his transfer to adult criminal jurisdiction. The circuit court heard testimony that Petitioner told Cpl. Keffer that he fell from a bed on top of the baby, and that he may have squeezed the baby too hard when he was frustrated. Petitioner also told Cpl. Keffer that the baby's leg "appeared to be in an odd angle" after he fell on the child, but he did not seek treatment for this injury until hours later. Later, Petitioner told Cpl. Keffer that he "probably shook the baby too hard." Petitioner's statements are dispositive on this issue. Given his statements, we find that even if admitting the complained-of medical statements violated Petitioner's right to confrontation, Petitioner cannot prevail because any such error was harmless beyond a

18

reasonable doubt.[13]  Petitioner, by his own admission, described injuries to his child and detailed the manner in which he was involved in injuring his infant son.

With respect to Petitioner's remaining assignments of error, we likewise find no merit.  The trial court did not abuse its discretion when it continued the initial transfer hearing.   Petitioner's adjudicatory hearing was scheduled for November 22, 2019.  The State timely filed its motion to transfer the case to the adult jurisdiction of the circuit court prior to that  hearing.[14]  At the November 22, 2019 hearing, the State requested a short continuance to enable it to provide full discovery to Petitioner.[15]  Counsel for the State acknowledged that the failure to provide the discovery was due, in part, to an oversight.[16]  Counsel for Petitioner objected to the motion to continue by arguing that the State had not shown good cause for continuing the matter.  After taking the facts and circumstances into consideration, the circuit court granted the State's motion to continue the transfer hearing

---

[13] Although we find that any error that may have occurred was harmless given Petitioner's admissions, we caution the State to be mindful of the right to confrontation at transfer hearings.

[14] Pursuant to West Virginia Code § 49-4-710(a) the State must file a motion to transfer jurisdiction "at least eight days prior to the adjudicatory hearing[.]"  The State filed its motion on November 7, 2019.

[15] Pursuant to Rule 20(e)(5) of the West Virginia Rules of Juvenile Procedure, the State was required to provide full discovery to Petitioner "no later than seven days prior to the transfer hearing[.]"

[16] It appears that the discovery had been provided to Petitioner's abuse and neglect attorney, but it was not provided to Petitioner's attorney in the juvenile delinquency case.

for a "period of approximately 30 days to allow full discovery to be disclosed to defense counsel." The transfer hearing was then held on December 18, 2019.

"'A motion for continuance is addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless there is a showing that there has been an abuse of discretion.' Syl. pt. 2, *State v. Bush*, 163 W. Va. 168, 255 S.E.2d 539 (1979)." Syl. Pt. 2, *State v. Jason H.*, 215 W. Va. 439, 599 S.E.2d 862 (2004). The abuse of discretion standard is not appellant friendly. *See State v. LaRock*, 196 W. Va. 294, 306, 470 S.E.2d 613, 625 (1996) citing note 6 of *Gentry v. Mangum*, 195 W. Va. 512, 520, 466 S.E.2d 171, 179 (1995). "In general, an abuse of discretion occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed but the circuit court makes a serious mistake in weighing them." *Id* at 307, 470 S.E.2d 613, 626. In this case, the circuit court considered the parties' arguments and decided that Petitioner would want all of the discovery. A brief continuance to permit such discovery is reasonable. We decline to disturb this ruling as the circuit court did not abuse its discretion by continuing the initial transfer hearing.

Likewise, with respect to Petitioner's argument regarding his school record exhibits, we find no error. Petitioner believes that the circuit court erred in admitting exhibit numbers 2-6[17] because the "chain of custody and authenticate [sic] was invalidated

---

[17] Exhibit 2 -- Petitioner's Fayette County Schools Official Withdrawal From School form, Exhibit 3 -- Fayette County Schools Withdrawal Application, Exhibit 4 -- Fayette County Schools Dropout Survey, Exhibit 5 -- Transcript Detail, and Exhibit 6 -- Juvenile Summary Information.

once the witness left the presence with [sic] the court with the records for an unknown period of time." Petitioner fails to allege and there is no evidence to support a finding that the exhibits at issue were altered during their absence from the courtroom. Further, the exhibits were marked with exhibit stickers, and Ms. Lively authenticated the exhibits. We find that the circuit court did not abuse its discretion in admitting these exhibits when they were inadvertently removed from the courtroom.

Finally, Petitioner argues that the circuit court erred "in transferring the case to criminal jurisdiction as there was insufficient evidence of [his] prospects for rehabilitation or any rehabilitative measures available through the juvenile justice system." West Virginia Code § 49-4-710 governs the waiver and transfer of juvenile jurisdiction to the criminal jurisdiction of the court. In some circumstances the transfer is mandatory, but in this case, the transfer is discretionary pursuant to West Virginia Code § 49-4-710, which provides:

> (g) The court may, upon consideration of the juvenile's mental and physical condition, maturity, emotional attitude, home or family environment, school experience and similar personal factors, transfer a juvenile proceeding to criminal jurisdiction if there is probable cause to believe that:
>
> (1) The juvenile, who is at least fourteen years of age, has committed an offense of violence to a person which would be a felony if the juvenile was an adult;
>
> . . . .
>
> (h) For purposes of this section, the term offense of violence means an offense which involves the use or threatened use of physical force against a person.

21

When considering these factors and "'[b]efore transfer of a juvenile to criminal court, a juvenile court judge must make a careful, detailed analysis into the child's mental and physical condition, maturity, emotional attitude, home or family environment, school experience and other similar personal factors.' W. Va. Code 49-5-10(d) [now W. Va. Code § 49-4-710(f) and (g)]." Syl. Pt. 2, *State v. Sonja B.,* 183 W. Va. 380, 395 S.E.2d 803 (1990). A review of the circuit court's order clearly shows that it considered the statutory factors set forth above. The circuit court found that Petitioner did not have a "mental disorder, learning disability, physical disability" and was not homeless. In addition, the circuit court found that despite the attempts of school administrators to address Petitioner's behavioral problems and truancy, "[t]he juvenile respondent voluntarily withdrew from school after he failed to attend school, failed almost all subjects during the last two years he attended, and had serious discipline problems consisting of violence, threats of violence, and insubordination." The circuit court also found that Petitioner decided to leave school after he had been offered an alternative program to help him "catch up and graduate." The circuit court went on to find that although Petitioner resided with his mother at the time of the alleged offenses, she "had no control over him" and that he had been "behaving as an adult for some time." In addition, Petitioner "began an adult relationship with a woman much his senior and was allowed to cohabitate with her in his mother's house." The Petitioner's emphasis solely on his prospects for rehabilitation is misplaced. While such prospects may be relevant, the statute governing the transfer to adult criminal jurisdiction lists numerous factors that the court should consider. The circuit

court clearly considered these factors and determined that they, on balance, weighed in favor of transferring Petitioner to its criminal jurisdiction.

"'Where the findings of fact and conclusions of law justifying an order of transferring a juvenile proceeding to the criminal jurisdiction of the circuit court are clearly wrong or against the plain preponderance of the evidence, such findings of fact and conclusions of law must be reversed. W. Va. Code, 49-5-10(a) [1977] [now 2001] [now codified as § 49-4-710 (2015)].' Syllabus Point 1, *State v. Bannister*, 162 W. Va. 447, 250 S.E.2d 53 (1978)." *Larry T.*, 226 W. Va. 74, 77, 697 S.E.2d 110, 113 (2010). The circuit court's findings of fact and conclusions of law were not clearly wrong or against the plain preponderance of the evidence in this case.

## IV. CONCLUSION

For the reasons set forth above, the circuit court's order transferring Petitioner's case to the criminal jurisdiction of the circuit court is affirmed.

Affirmed.